**Opinion issued October 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

**NO. 01-22-00789-CR**

**NO. 01-22-00790-CR**

**NO. 01-22-00791-CR**

———————————————

## EX PARTE RICKEL TONIO BAKER, JR.

---

**On Appeal from the 240th District Court**
**Fort Bend County, Texas**
**Trial Court Case Nos. 22-DCR-099972, 20-DCR-092879A, 20-DCR-092879B**

---

### MEMORANDUM OPINION

A jury acquitted Appellant Rickel Tonio Baker, Jr. of manslaugher and criminally negligent homicide arising from a motor vehicle collision in which his four-year old son J.B. was killed. The State later sought to prosecute Baker for injury

to a child and aggravated assault with a deadly weapon based on injuries sustained in the same collision by his eight-year old son T.B. who survived the crash.

Baker filed a pretrial application for writ of habeas corpus in which he argued the doctrine of collateral estoppel embodied in the Fifth Amendment's guarantee against double jeopardy barred the State from prosecuting him for injury to a child and aggravated assault with a deadly weapon against T.B. He also argued that because the State had chosen to proceed to trial on the charges of manslaughter and criminally negligent homicide against J.B. only, the State was estopped or had waived its right to try him for the other offenses involving T.B. arising from the same motor vehicle collision. The trial court denied Baker's pretrial application for writ of habeas corpus. This appeal ensued.

We affirm.

## Background

On August 4, 2020, Carolyn Baker called her father to request help with a flat tire for her Porsche Cayenne. Appellant Rickel Tonio Baker, Jr., Carolyn's younger brother, came to her aid. Baker, his wife, and his two young sons drove in a Chevrolet Cruze to meet Carolyn. Baker replaced the flat tire with a temporary "donut" tire and followed Carolyn in her Porsche as she drove to a tire shop via the Fort Bend County Toll Road. Baker's wife, Kourtney Hatton, was siting in the front passenger seat of the Cruze and their sons, four-year-old J.B. and eight-year-old

2

T.B., were sitting in the backseat of the Cruze. J.B. was sitting behind Baker and T.B. behind Kourtney.

Daniel Hurtado also was traveling on the Fort Bend County Toll Road that day. He was driving a Chevrolet Silverado flatbed pickup truck with a trailer filled with heavy equipment when he struck Baker's Cruze from behind, causing the Cruze to accelerate rapidly and strike Carolyn's Porsche. T.B. was seriosuly injured in the crash and J.B. died of his injuries.

On September 21, 2020, Baker was charged by indictment with manslaughter against J.B. (trial court cause number 20-DCR-092878) and with aggravated assault causing serious bodily injury against T.B. (trial court cause number 20-DCR-92879).[1] Both charges stem from the injuries the children sustained in the car crash. On October 11, 2021, Baker was reindicted for manslaughter against J.B. (trial court cause number 20-DCR-092878A) and aggravated assault causing serious bodily injury against T.B. (trial court cause number 20-DCR-092879A).[2] And on June 27, 2022, Baker was re-indicted for aggravated assault causing bodily injury (trial court cause number 20-DCR92879B) and indicted for injury to a child with respect to T.B. (trial court cause number 22-DCR-99972).

---

[1]    Neither indictment is included in the clerk's record filed in this appeal.

[2]    The original indictment for aggravated assault in 20-DCR-92879-CR was dismissed on December 11, 2021. Neither the original indictment nor the dismissal is in the clerk's record.

3

Baker was tried for the offense of manslaughter against J.B. in trial court cause number 20-DCR-092878A. The manslaughter indictment alleged that Baker

did then and there recklessly cause the death of … J.B. … by failing to control speed, following too closely, not using proper emergency devices, and not properly restraining [J.B.], while driving his motor vehicle that was occupied by [J.B.] and causing it to collide with another vehicle.

## Manslaughter Trial

### A.   Pre-Trial Hearing

During a pretrial hearing, the State argued that it had the option of going to trial on the manslaughter charge against J.B. (20-DCR-092878A), the aggravated assault charge against T.B. (20-DCR-092879A), or both, and the State had opted to proceed with the manslaughter charge against J.B. only. The State told the trial court:

So the manslaughter is the only case, Judge, that we intend to ask the jury for a verdict on. They're out of the same transaction, so we'll hear the same set of facts.

But as far as when we ask them for a—when we give them the charge, we will only be charging him on the manslaughter.

Baker objected to the "piecemeal" nature of the proceedings and requested that the manslaughter charge against J.B. (20-DCR-092878A) and the aggravated assault charge against T.B. (20-DCR-092879A) be consolidated and tried together because the offenses arose from the same motor vehicle collision. Baker argued:

4

Exact same case. It's the same crash. Exact same everything. It's just two different kids in the backseat of a car. And to split up a criminal trial, have two different criminal trials for two different kids in the backseat – it's going to be the exact same case tried twice. So, for efficiency for all of us, I think we need to try them both together.

The State disagreed that the charges should be tried together:

State: It is not the State's position that we will have two criminal trials. Our intention is to go forward on the criminal trial on the manslaughter . . . We're not asking for a second criminal trial later.

Baker: Well, so does that mean they're dismissing the aggravated assault charges?

State: Not today.

Court: Not at this time.

Baker: So we would –

Court: It can happen in the future, but not today.

The trial court overruled Baker's objection and trial commenced on the manslaughter case.

## B. Indictment

After the jury was impaneled, the trial court presented the manslaughter indictment:

In the name and by authority of the State of Texas: The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, Rickel Tonio Baker, Jr., hereafter styled the defendant, heretofore on or about August 4, 2020, did then and there, recklessly cause the death of an individual, namely, J.B., a minor child and hereafter called the complainant, by failing to control speed, following too closely, not

5

using proper emergency devices or not properly restraining complainant, while driving his motor vehicle that was occupied by the complainant and causing it to collide with another motor vehicle.

Baker pleaded not guilty.

## C.    Opening Statements[3]

In its opening statement, the State told the jury that the evidence would show that Baker was driving his Chevrolet Cruze northbound on the Fort Bend County Toll Road when the Cruze was struck from behind by a truck pulling a trailer loaded down with heavy equipment. Baker, who had just changed a flat tire on his sister's Porsche, was driving behind his sister's car when the collision occurred. The prosecutor stated that Baker was driving the Cruze, that his wife Kourtney Hatton was sitting in the front passenger seat, and that their sons, J.B. and T.B., were sitting in the backseat. J.B. was sitting behind the driver's seat and T.B. was sitting behind the passenger seat. According to the State, the Cruze's hazard lights were not flashing and none of the car occupants were wearing a seatbelt or child safety seat. Because Carolyn's Porsche was driving on a temporary tire, the Porsche and Baker's Cruze were traveling 18 miles per hour on the tollway, which has a posted speed limit of 65 miles per hour.

---

[3]    The excerpts from the record of the manslaughter trial Baker attached to his pretrial application for writ of habeas corpus do not include a transcript of the voir dire proceeding.

6

Daniel Hurtado, the driver of a Chevrolet Silverado flatbed pickup truck, was also traveling northbound on the Fort Bend County Toll Road. When he spotted the Cruze ahead of him on the right lane of the toll road, Hurtado initially thought the slow-moving car was stalled. According to the State, the evidence would show that Hurtado immediately hit his brake and took evasive efforts, but Hurtado was unable to switch lanes quickly enough to avoid hitting the Cruze. The prosecutor stated:

> You're going to hear evidence from several different witnesses that will be able to explain to you why no matter who was in that car or what they were doing in Mr. Hurtado's truck, that crash occurs. And it occurs because there was no indication to the driver -- other drivers on the Fort Bend County Toll Road that [the Cruze] was a hazard.

The State asserted that the jury would hear evidence that J.B. died from the injuries he sustained in the collision and the State concluded by stating:

> So in the end, when you guys are looking at whether or not [Baker] was reckless and the things that he did that we've alleged and talked about in voir dire, right, not controlling his speed, not using his hazard lights, not restraining his children, any one of those on their own y'all can determine is reckless enough.

> But at the end of the evidence, you will have heard more than enough information to be able to determine that Mr. Baker was reckless and Mr. Baker was the one that caused the death in this case of [J.B.]

In his opening statement, Baker's counsel asserted:

> And so the charge is Mr. Baker caused the crash in those three ways: Speed, his slower speed; following too closely, no idea what that -- what car that refers to; not using proper emergency devices.

> And those are three ways they are charging he caused just the crash. The crash did cause death. But those are three ways – only concern

7

causing the crash. . . and the fourth thing that they're saying is Mr. Baker caused the death of his 4-year-old son [J.B.] by not properly restraining him. That has nothing do with who or what caused the crash. That has to do with would a proper restraint have made. . .

The State objected to these statements as a misstatement of the law and the court sustained the objection. Baker's counsel continued,

> So the evidence, ladies and gentlemen, will show that this crash was so big by that truck slamming into the back of that tiny car, that tragically and unfortunately a restraint was not going to save this child's life.
>
> . . . .
>
> Now, about a mile and a half after they pass through that toll station the evidence will show that a company truck towing a trailer weighing 20,065 pounds, seven times as heavy the tiny 3,000-pound Cruz[e], slams into the back of the Cruz[e]. That's the crash.

With respect to Hurtado, Baker's counsel asserted the evidence would show that Hurtado was "speeding at 73.9 miles an hour moments before the crash," and was "fatigued and too tired to be driving because he had just started a night shift job and he had just worked a 13- or 14-hour night shift, then another 13- or 14-hour night shift." Baker asserted that Hurtado "was using his iPhone at the time of the crash," and he was distracted by the equipment in the back of his truck and trailer. According to Baker's counsel:

> And so [Hurtado] was worried that his load was going to fly out. And he's admitted—the evidence will show, he's admitted that he was so worried about his load flying out, that that was a cause of the crash.
>
> So he will admit on the stand that that was the cause of this crash. His speeding was a cause of the crash. I don't know what he's going to say

8

about the other items, but there's—evidence on all of this. The evidence will show Mr. Hurtado was following way too close to traffic in front of him. You're going to hear him talk about an SUV that did something before the crash. I'm going to wait and see what they say about that.

. . . .

None of us are here—none of us are here to say that not having your child in a proper restraint can ever be allowed. And I'm not sanctioning that. No one in this courtroom is sanctioning that.

It was a bad decision. It was not a good decision at all. I've got three kids. I got—they used to be in—you know, you've got booster seats and all kinds of car seats. And the child needed to be in such a restraint— and I'm not trying to tell any of y'all that— I'm not trying to make excuses. It's not good. I'm not making any excuses for that.

But here's what's important: Causation. Cause means they have to prove reck—anything they say was reckless caused—the evidence will show—so they've got to show with evidence that if there was a restraint then their child would have survived.[4]

With respect to causation, Baker's counsel also stated that Hurtado's truck had struck the Cruze from behind with such force "that the seat the 230-pound [Baker] was in, broke, slammed back, hit his son [J.B.] from head to his knees."  He stated, "It is – it's a terrible thing that happened.  It happened because the truck rear-ended him, seven times the size of it.  That's what the evidence is going to show."  Baker's counsel stated that child safety seats which are intended to "prevent someone from being ejected and thrown out of the vehicle," could not "protect

---

[4]    The State objected to this statement as a misstatement of the law and the court sustained the objection.

everybody in every crash." He stated, "This case is about the rear-end from the big truck into the small car [that] caused this terrible crash."

## D. State's Witnesses

### 1. Shone Joy

Shone Joy, a deputy with the Harris County Sheriff's Office, was driving north on the Fort Bend County Toll Road in the left lane when she witnessed the collision in her peripheral vision. She testified that she saw Hurtado's truck strike the Cruze from behind, and then she noticed "a light colored SUV losing control" and crossing over into the left lane and hitting the concrete barrier. She could not tell if "anybody was speeding or going too slow or the speed at all." Deputy Joy pulled her car onto the shoulder and returned to the scene of the collision where she observed Hatton sitting on the ground outside the Cruze, cradling a bleeding J.B. in her arms. According to Deputy Joy, "[e]verybody else was inside the car." She identified Baker as the driver of the Cruze.

### 2. Emily Kennedy

Emily Kennedy, a paramedic with Austin County EMS, responded to the scene of the crash. When she arrived, T.B. was being treated by a firefighter in the backseat of the Cruze. According to Kennedy, she did not see any child safety seats in the Cruze. Kennedy testified that "the safest place for a child is in a [child safety]

10

seat." She did not express any opinion as to fault or causation regarding the crash, J.B.'s death, or T.B.'s injuries.

### 3. Daniel Hurtado

Daniel Hurtado was driving the Chevrolet Silverado flatbed pickup truck with a trailer on the Fort Bend County Tollway the afternoon of the crash. The trailer was filled with heavy equipment. Hurtado was traveling northbound on the toll road. He testified that traffic was light that afternoon and it was moving "pretty fast." When he passed through a toll station located a mile south of the crash site, Hurtado was driving in the left lane of the toll road at 67 miles per hour. He moved into the right lane because he was driving slower than the other vehicles and impeding the flow of traffic in the left lane. He set the truck's cruise control at 73 to 74 miles-per-hour even though he knew the posted speed limit was 65 miles per hour.

Moments before the crash, an SUV driving in front of Hurtado in the right lane suddenly swerved into the left lane, revealing to Hurtado the Cruze directly in front of him. Hurtado, who initially thought the slow-moving Cruze was stalled, braked, disengaging the truck's cruise control. He quickly realized he did not have enough time to stop, and he tried to swerve into the left lane to avoid hitting the Cruze. Hurtado, however, was not able to move into the left lane quickly enough and his truck struck the Cruze from behind. Hurtado testified he "did not see any lights" on the rear of the Cruze.

After the crash, Hurtado saw Hatton sitting on the ground outside the Cruze with an injured J.B. in her arms, and T.B. in the back seat of the Cruze on the passenger side. Baker was sitting in the Cruze's driver's seat and there were no child safety seats in the car.

Hurtado testified that, depending on the speed, he gives himself four seconds between his truck and the vehicle in front of him. He believed he was traveling at a safe speed and distance from other vehicles before the crash given that the speed limit on the road was 65 miles per hour. Hurtado testified that the video from the toll plaza appeared to show that neither the Cruze nor the Porsche had their hazard lights flashing. Hurtado testified he felt he had done everything he could to avoid the crash given the circumstances and it would have been helpful if the Cruze and Porsche had their hazard lights flashing.

On cross-examination, Baker's counsel questioned Hurtado extensively about the cause of the collision. Hurtado testified he would have been able to avoid hitting the Cruze if the hazard lights on the Cruze had been flashing, if the Cruze were "traveling at a []faster speed," and if he had seen the Cruze's flashing lights "at a distance." Hurtado admitted, however, that he was not able to see the Cruze "from a good distance" because an SUV was traveling in the right lane of the toll road in front of him before the crash. When asked if the SUV was "a huge part of why this crash happened," Hurtado testified there was "an SUV in front of me that did not

12

allow me to see the black [Cruze] in front of me." When asked if his truck had been 200 feet from the SUV when the SUV swerved to the left lane, Hurtado testified, "I don't remember how far it was, but it was a good distance between me and the [SUV in] front of me." Hurtado admitted that during his deposition, he testified he believed the SUV had been 200 feet in front of him.

Hurtado, who did not have a commercial driver's license, testified he had a "full load" in the back of his truck and on the trailer. When asked if his truck and trailer weighed more than 20,000 pounds, Hurtado testified he did not know the exact weight, but he knew he was driving "a really heavy vehicle" and "heavier vehicles are harder to stop." When asked if he would have been able to avoid hitting the Cruze had he not been pulling such a heavy load, Hurtado testified:

> If I didn't have the amount of weight that I had and the vehicle in front of me was moving the same speed as I was, I wouldn't have struck them.
>
> The fact that they were going a lot slower than I was, and by the time I seen them, by the time I reacted, I tried pressing my brake, with the weight that I had.

When later pressed about the impact his truck and the trailer's weight had on the collision, Hurtado admitted he "could have stopped the truck if [he] didn't have such a heavy load."

Hurtado testified that he routinely checks his mirrors to make sure his equipment does not come lose or fly away. When asked if this causes him to take

13

his eyes off the road, Hurtado testified that it does, but only for a "slight moment." Hurtado testified that he set his truck's cruise control at 73–74 miles per hour even though he knew the posted speed limit on the toll road was 65 miles per hour. He admitted that if he had been driving "significantly slower" he would have had "maybe a fraction of a second" more to react once he saw the Cruze in the lane ahead of him.

Hurtado testified that after the crash, he saw that the driver's seat in the Cruze was reclined all the way back and it was touching the back seat. He admitted that when he spoke to the officers after the crash, he told them it was a "hard hit" and if a child had been sitting behind the driver's seat, the child would have been crushed and probably killed.

Hurtado, who had just started working the night shift, worked a fourteen-hour shift the night before the crash. Hurtado had slept less than five hours before the crash, which he admitted was less sleep than he needed to be well rested. Nevertheless, Hurtado believed he had gotten adequate sleep the night before and he never thought he was "not safe to drive." Although he denied being on his cell phone when the crash occurred, Hurtado admitted he uses Apple maps on his phone, and he had the application open around the time of the collision. Baker's counsel also questioned Hurtado about the light-colored SUV Hurtado claimed was driving in

front of him on the tollway obscuring his view of the Cruze attempting to cast doubt as to the existence of the SUV.

Hurtado testified that he "didn't see any drugs or alcohol in the [Cruze] when [he] peeped in," but he could smell something that "could be tobacco or marijuana." Hurtado also admitted, however, that during his deposition, he only stated he was "able to smell a heavy odor of cigarettes."

### 4. Carolyn Baker

Carolyn Baker is Baker's older sister. Carolyn testified she was driving her Porsche SUV down Highway 6 when she got a flat tire, and she waited in the parking lot of a fast-food restaurant for Baker or her father to arrive to help her change the tire. Baker arrived and replaced the flat tire with a "donut" or "dummy" tire. Baker, who was driving the Cruze, then followed behind Carolyn's Porsche as she drove to a tire shop. Carolyn testified there was no tire shop at the nearby gas station, so she decided to drive to the tire shop she normally used. She chose to drive there via the Fort Bend County Toll Road rather than Highway 6 because she thought it would be faster. Carolyn testified that she could not drive faster than 20 miles per hour because she was driving on a donut. The posted speed limit on the tollway is 65 miles per hour.

Carolyn testified that a photograph taken by the toll plaza reflected she was driving 18 miles per hour when she drove by the toll plaza, and she could not tell

from the photo whether the hazard lights of her Porsche were flashing. According to Carolyn, she drove in the right lane when she entered the tollway because traffic is generally faster in the left lane, and she did not drive on the shoulder because she "didn't believe that would be safe."

Carolyn testified she did not remember much about the crash, but she remembered she was wearing her seatbelt and using the hazard lights of her Porsche. According to Carolyn, she and Baker "had [their] hazard lights on the entire time." Carolyn's Porsche was rear-ended by Baker's Cruze after Hurtado's truck rear-ended the Cruze.

### 5. Martin Garret

Lieutenant Martin Garret with Fort Bend County Constable Precinct 3 was the primary deputy who investigated the crash.[5] On direct examination, Lieutenant Garret testified about the location of the Porsche and the Cruze at the scene, the vehicles' conditions, and the marks on the roadway. He testified the Cruze had "substantial damage to the rear and it look[ed] like [it was] a little bit more towards the right of center." According to Lieutenant Garret, the Cruze was "struck with such force [from behind] that the door frame on the back left started to collapse downward." He testified that the damage to the rear of the Cruze indicated that

---

[5] When the accident occurred, Martin Garret was a sergeant with Fort Bend County Constable Precinct 4.

Hurtado had swerved to the left prior to impact. With respect to the interior of the Cruze, Lieutenant Garret testified that "the driver's seat [was] leaned back all the way," there were "no car seats, no booster seats in this vehicle," and "none of the seat belts in this vehicle [had been] used."

As part of his investigation, Lieutenant Garret took measurements and prepared a diagram of the crash site. He also inspected the Cruze after it was towed to the wrecker yard. Lieutenant Garret removed a light bulb from the Cruze's left-rear light housing, and he determined from the bulb's filaments that the bulb was off when the crash occurred. Lieutenant Garret also obtained Baker's and Hurtado's phone records and data from the Cruze's and the truck's airbag modules, which are also referred to as black boxes. According to Lieutenant Garret, the Cruze's airbag module indicated that neither Baker nor Hatton were wearing their seat belts, which was consistent with his observations. The data also reflected that the Cruze was traveling 18-19 miles per hour at the time of the collision, which Lieutenant Garret considered to be "a very unsafe speed" and "equally dangerous" as driving 105 miles per hour. The truck's airbag module indicated Hurtado was wearing his seatbelt and the truck was traveling 74 miles per hour 5 seconds before the crash and 70 miles per hour half a second before impact. Lieutenant Garret did not consider 70–74 miles per hour to be unsafe speeds to travel on the tollway and he noted that "people drive faster."

On cross-examination, Lieutenant Garret testified that hazard lights are intended to draw attention to a car, and drivers in emergency situations should use their hazard lights because they will "warn other drivers that there's something going on, you may have an emergency." According to Lieutenant Garret, Baker should have been using his hazard lights while driving on the tollway, and if he had, it would have given Hurtado "extra time to observe" the slow-moving Cruze. Lieutenant Garret was questioned extensively about the light bulb he retrieved from the Cruze and the basis for his opinion that the light was not in use when the crash occurred.

Lieutenant Garret also testified about the damage sustained by the Cruze. According to Lieutenant Garret, the rear left door frame of the Cruze collapsed downward, and J.B. was sitting in the back seat of the Cruze, on the left side of the vehicle behind the driver. The right side of the Cruze, where T.B. had been sitting behind Hatton's seat, also sustained collateral damage. Lieutenant Garret did not know whether the driver's seat had broken as a result of the crash. He also testified that unlike Baker's driver's seat, Hatton's front seat was not reclined, and T.B., who was seated behind Hatton, survived the collision. Lieutenant Garret testified that the Cruze's right side, where T.B. had been sitting in the backseat, had sustained more damage than the left side of the car where J.B. had been sitting.

Lieutenant Garret reviewed a download of Hurtado's cell phone records for 5:28 p.m., the time of the crash, and he "found no evidence that Mr. Hurtado was

either on the phone, [or] texting at the time of the accident." Lieutenant Garret testified that he checked Hurtado's eyes at the scene, but he did not perform any field sobriety tests on Hurtado. He contacted Baker the day after the crash and Baker fully cooperated with the investigation. He also obtained videos of the Porsche, the Cruze, and the truck at the toll plaza and still photos of the Porsche and truck. He was questioned about the lack of a still photo of the Cruze.

Lieutenant Garret was also questioned about his preparation of the crash site diagram and the contents of the crash report. He confirmed that his diagram indicated "there [were] 134 feet between the Cruz[e] and the Porsche SUV" and he considered that to be a safe distance given the speed the two vehicles were traveling. Lieutenant Garret testified that his role was to determine how the crash happened, not who was at fault. He does, however, "document contributing factors" and he admitted "those are factors that cause the crash."

When questioned about the crash report he prepared, which was admitted into evidence as State's Exhibit 8, Lieutenant Garret testified that one contributing factor to the crash was Hurtado's "failure to control speed." According to Lieutenant Garret, "[f]ailure to control speed in Texas means that the driver failed to bring that vehicle to a stop before striking the vehicle in front of him. . . [it] has nothing to do with speeding." Lieutenant Garret testified that Hurtado was "over the speed limit and he failed to bring the vehicle to a stop before striking the vehicle in front of

19

him." He also testified that, in his opinion, no one involved in the crash was impaired.

On redirect examination, Lieutenant Garret testified that Baker, Hatton, and the children had been taken to the hospital before he arrived at the scene, and he was not able to perform any field sobriety tests on Baker or obtain a blood sample from him. He obtained a blood sample from Hurtado and the sample tested negative for alcohol and drugs. When Lieutenant Garret reviewed the toll plaza video he did not see "any indication that [the Cruze's] hazard lights were on when [Baker] went through the toll plaza." Lieutenant Garret testified that when he walked around the Cruze and the Porsche at the scene, he "smelled the strong odor of marijuana coming from the vehicles."

On recross examination, Lieutenant Garret testified that he did not find any physical evidence of drug use inside the Cruze, and although he did not mention the smell of marijuana in his crash report, it was not necessary for him to do so because there was "nowhere on the report for that."

### 6. Ryan Musil

Ryan Musil is a Deputy with the Harris County Sheriff's Office's vehicular crime's division. Deputy Musil has extensive training in accident investigation and reconstruction, including accreditation in accident reconstruction by the Accreditation Commission for Traffic Accident Reconstructionists. Deputy Musil

20

testified regarding the type of records he reviews to perform an accident reconstruction.

Based on his review of the records in this case, Deputy Musil concluded Baker was at fault. When asked how he reached this conclusion, Deputy Musil testified that it generally takes a driver 1.5 seconds to perceive a hazard and react to it. A person's perception and reaction time, however, may be longer or shorter depending on the circumstances. According to Deputy Musil, it is more difficult to recognize a hazard when approaching a slower moving vehicle and he added 0.3 seconds to Hurtado's perception and reaction time because the slow-moving Cruze was not providing any "visual clues" indicating that it posed a hazard to other motorists.

Deputy Musil testified that he was able to determine whether Hurtado had enough time to perceive and react to the Cruze as a hazard by calculating the distance between the Cruze and the truck after the SUV in front of Hurtado switched lanes, Hurtado's possible reaction times, and the amount of time Hurtado would have needed to avoid the collision. According to Deputy Musil, the data indicated Hurtado "react[ed] to the collision between one and a half seconds by steering and applying the brake" and this "supports [that] when that SUV moved over, he perceived this as an immediate hazard." Deputy Musil testified that the truck's driving behavior indicated Hurtado was "an attentive driver" and that even in the best-case scenario, there was not enough time for Hurtado to have avoided the crash.

21

According to Deputy Musil, the distance between the Porsche and Cruze probably would not have made a difference in the crash unless the Porsche was substantially further ahead. In that scenario, the second collision between the Porsche and Cruze "would be less likely."

When asked if it is "considered failing to control your speed if you're severely below the [speed] limit," Deputy Musil testified that a driver has an "obligation not to drive so slowly on the roadway where he's interfering or impeding with a normal or reasonable flow of traffic." According to Deputy Musil, someone who is interfering or impeding the normal flow of traffic, like Baker, is also failing to properly control their speed.

Deputy Musil also was questioned about the rules of the road in Texas and what drivers should do when their car experiences mechanical problems. According to Deputy Musil, in the event of a breakdown, drivers are supposed to activate the emergency flashers and "move off the edge of the roadway." Deputy Musil testified that every licensed Texas driver has this information because it is included in the Texas Driver's Handbook. According to Deputy Musil, hazard lights are important and should be used when a driver is driving 18 to 20 miles-per-hour because such a driver would be a danger to himself and others. Deputy Musil testified that "failing to activate your emergency equipment in situations when you're going dangerously slow" is "reckless behavior" capable of causing serious injury or death. Based on

22

the video taken at the toll plaza, Deputy Musil concluded that Baker was not operating his emergency equipment properly because he was not using the Cruze's hazard lights. Deputy Musil testified that in addition to not activating the Cruze's hazard lights, Baker was also driving in a "moving lane of travel" and "those two factors are very dangerous by themselves."

Deputy Musil testified about the lack of child safety seats in the Cruze. According to Deputy Musil, child safety seats protect children from outside forces, keep them from moving around inside the vehicle, and prevent them from being ejected from the vehicle in the event of a collision. A child safety seat could also protect a child who gets "whacked with the seat from ahead of them." Deputy Musil testified that both J.B. and T.B. should have been using some type of child safety seat, which would have provided them with additional protection during the collision.

Deputy Musil testified that the crash was "absolutely" avoidable. When asked for the basis of his opinion, Deputy Musil testified:

> The main factor is there was an intentional decision, once this vehicle that was experiencing a mechanical or tire malfunction, to not only get back on the road, to realize there would still be a problem. But to pull off and get back on the road again at a much higher speed limit, that by itself is a reckless act.
>
> . . . .
>
> So that's – that's the main point of my analysis, that that vehicle should not have been on the road. There were other alternatives that they had.

23

There was an open seat in the Chevy Cruz[e], if they needed to leave that vehicle to arrange for it to be towed to a safe location. There were – there was other alternatives to driving on the tollway that day.

Deputy Musil faulted Baker for not leaving the children at home when he went to help his sister fix her flat tire. He also testified that there were multiple tire shops between the parking lot off Highway 6 where Baker fixed the Porsche's flat tire and the toll road and "those would have been much safer alternatives to leave the car there." Deputy Musil testified that driving well below the speed limit is dangerous and is likely to result in a fatality. He did not know who chose the route to the tire shop.

On cross-examination, Deputy Musil testified about the materials he reviewed when reconstructing the crash and the assumptions he made as part of his analysis. With respect to a driver's perception and reaction time, Deputy Musil agreed that being distracted, tired, or using a phone would lengthen the driver's perception and reaction time. A driver's perception and reaction time also increases if there are no visual indications of a dangerous condition, such as flashing hazard lights, and Deputy Musil assumed for purposes of his analysis that the Cruze's hazard lights were not activated prior to the collision. Deputy Musil testified that he took Hurtado's statements about the SUV driving in front of him at face value. He was also cross-examined about the type of child safety seat J.B. should have been using.

24

Deputy Musil was also questioned at length about the speed at which Hurtado was traveling and whether the speed had been a contributing factor in the crash. Deputy Musil testified that the crash report listed Hurtado's "failure to control speed" as a contributing factor and when asked if he "would consider that at fault as well," Deputy Musil testified, "If that's the ultimate cause of it, yes." Deputy Musil denied that Hurtado was at fault in the crash. He admitted that his opinion that Hurtado could not have prevented the collision assumed Hurtado was "not distracted, not using his phone" or tired. Deputy Musil likewise was cross-examined regarding the requirements of Texas law with respect to Baker and Hurtado. Deputy Musil was asked whether Hurtado was driving at a speed greater than was reasonable and prudent under the circumstances and failed to control his speed as necessary to avoid colliding with another vehicle, both of which would violate Texas law. With respect to Baker, Deputy Musil testified that although Texas law permits a driver to drive at a reduced speed if a special hazard exists, Deputy Musil disagreed with Baker's counsel statement that the "whole entire flat tire situation" was a special hazard that would allow Baker to drive slowly.

### 7. Mariane Beynon

Dr. Mariane Beynon, the assistant medical examiner at the Harris County Institute of Forensic Sciences, performed the autopsy on J.B. She testified that J.B. had sustained more than a dozen blunt force injuries to his head, neck, torso, and

extremities, and laceration on the back of his head. He also sustained extensive internal injuries to his head, neck, and torso. According to Dr. Beynon, the manner of J.B.'s death was an "accident," and the cause of his death was "multiple blunt force injuries." On cross-examination, Dr. Beynon acknowledged she was offering no opinion as to what would have happened to J.B. had he been properly restrained.

### 8. Matt Levan

Sargent Matt Levan with the Sugar Land Police Department is a digital evidence examiner. Sargent Levan secured Baker's phone records which reflected that Baker was on a phone call from 5:22 p.m. until about 5:50 p.m. the day of the crash. He also downloaded data from Hurtado's phone which showed Hurtado made a phone call at 5:28 p.m.

### 9. Felicia Baker

Felicia Baker is Bakers' stepmother and J.B.'s and T.B.'s step-grandmother. Felicia testified that she was the owner of the Cruze and she consented to the retrieval of data from the car's air bag module. She identified a picture of J.B., and the defense stipulated that J.B. was the child who died in the crash. Felicia testified that T.B., who was sitting behind the front passenger seat, sustained a brain injury and his leg was severely injured in the collision. According to Felicia, T.B.'s leg required multiple medical procedures, and he spent months in the hospital and a

rehabilitation center where "[s]peech is one of the things that I think he had to work on. Of course, with the legs, walking."

### E.  Motion for Directed Verdict

After the State rested its case, Baker moved for a directed verdict on the element of recklessness arguing the State had presented no evidence to establish he had the requisite *mens rea* as to any of the four manners and means alleged in the indictment.[6] According to Baker, there was no evidence Baker appreciated and consciously disregarded an unjustifiable risk.  Baker also moved for a directed verdict as to the manner and means of following too closely because Lieutenant Garret testified that "Baker's allegedly following too close behind the Porsche had nothing to do with the death" of J.B, and thus "there is no evidence where the jury can conclude that that was an actual cause of [J.B.'s] death."

The State countered that Baker was not entitled to a directed verdict because there was more than a scintilla of evidence supporting each element of the charged offense.  The trial court denied Baker's motion for directed verdict.

---

[6]    The indictment alleged the following four manners and means: (1) failing to control speed, (2) following too closely, (3) not using proper emergency devices, and (4) not properly restraining the complainant.

**F.      Defense Witnesses**

**1.      Andrew Erwin**

Andrew Erwin was Baker's expert accident reconstructionist. Erwin inspected the Cruze and Hurtado's truck and trailer, and he conducted a FARO scan[7] of the vehicles. He reviewed the owner's manual for the Cruze, the crash report, and the photos and videos obtained by law enforcement, including photos and videos from the toll plaza. According to Erwin, the Cruze's rear taillight housings have four light bulbs and the light bulb Lieutenant Garret inspected, which was admitted into evidence, illuminates when the Cruze's brakes are applied and when the head lamps are turned on, not when the hazard lights are activated. Erwin separately testified that based on the evidence provided to him, he determined the Porsche's hazard lights had been activated when the crash occurred.

Erwin testified there was no posted minimum speed limit on the toll road. He also testified about Texas traffic laws. According to Erwin, drivers may "drive at reduced speeds if [they are] handling or responding to emergency situations or . . . encounter situations that might require reduced speeds for vehicle safety." Drivers are also prohibited from "impeding normal and reasonable flow of traffic" and

---

[7]      According to Erwin, "FARO scans are a laser mapping procedure where both the scene and the vehicles and the trailer were laser mapped to a degree that is quite accurate, to less than a quarter of inch of accuracy. That information was used to analyze and reconstruct the accident."

driving on an "improved shoulder." According to Erwin, the right lane is the toll road's "slow lane" and "slower traffic would be expected to be there."

Erwin testified that the Porsche and Cruze were driving northbound in the right lane of the toll road. The Cruze, which was behind the Porsche, was traveling approximately 19 miles per hour. Hurtado's truck, which was pulling a trailer, was traveling approximately 74 miles per hour as it approached the Cruze from behind. According to Erwin, three-quarters of a second before impact, Hurtado applied the truck's brake, disengaging the truck's cruise control which was set at 74 miles per hour. Hurtado steered left at approximately the same time, but his truck did not "move left very much and it ha[d] a center impact into the rear of the Chevrolet Cruz[e]." According to Erwin, the Cruze accelerated from 19 miles per hour to 62 miles per hour within one-tenth and two-tenths of a second due to the impact, causing the Cruze to collide with the back of the Porsche.

Erwin testified that the impact of the truck "crushe[d] the back of the Chevrolet Cruz[e] forward so much that the rear [seats were] getting pushed forward relative to where they used to be." The impact also caused the driver's seat in the Cruze, where Baker was sitting, to recline so far back that its headrest touched the car's backseat.

When asked if "a reasonably attentive driver, driving at the posted speed limit, maintaining a proper following distance, who reacts in the same way Mr. Hurtado

29

reacted in this wreck, [could] have avoided this collision," Erwin testified "he would have." Driver inattention and fatigue can slow a driver's reaction time. However, according to Erwin, "it's not a question of perception or response, it's just mathematics," and he explained why the collision would not have occurred under those circumstances. Erwin also testified regarding a proper child safety seat for J.B.

On cross-examination, Erwin testified he did not have an opinion regarding whether the Cruze was operating at a dangerously slow speed, but he could say "traveling at 19 in a 65-zone creates a hazard in the roadway. It does. But I also understand there's descriptions that that hazard was marked as a slow moving vehicle with hazard lights." He testified Hurtado's evasive action was an "appropriate response." Erwin also explained how he conducted his evaluation, the formulas and equipment he used, the evidence he relied on, and his certifications. He also testified:

> Q. And I guess if I heard you correctly, Mr. Erwin, really the only thing that you disagree with the deputies in this case with regards to reconstruction is that the crash could have been avoided if [Hurtado] were doing 65 instead of 70—almost 74?

> A. Mr. Hurtado, yeah, if they think that it would not have been, then, mathematically I would demonstrate that's incorrect. But, you know, if he does the same things and his speed decreases the same way as it was from 74 and then he hits the brakes and steers, he's going to miss that car.

Erwin testified that a driver's perception and reaction time can increase when they are "in a situation with other moving vehicles," but it does not always and "some reactions can be quicker to situations that are dramatic."

Erwin testified that while "there are situations where operators can drive on the improved shoulder legally," the driver should only do so if they "want to bring it to a stop" because the law "does not allow you to just get over there [on the shoulder] and drive." Erwin also testified that drivers may also "drive on an improved shoulder to allow another vehicle traveling faster than [them] to pass," and there are "super limited situations" when drivers may drive on the shoulder to pass another vehicle.

Erwin agreed that no one in the Cruze was restrained and "anyone transporting a child younger than 8, unless they are taller than 4-foot-9, []should be in some sort of child safety restraint." According to Erwin, J.B. was shorter than 4-foot-9 and he did not know how tall T.B. was, but he had a copy of the child's medical records and he could determine that information.

### 2. Mike Stone

Mike Stone is the chief operating officer of Mike Stone Associates, which operates and manages the Fort Bend County Toll Road System. Stone testified about the camera and video equipment used at the toll plaza to record vehicles passing

31

through the toll plaza. According to Stone, Deputy Garret requested video and still photographs of the Porsche, the Cruze, and the truck the day of the crash.

## G. Jury Charge

The jury was charged with manslaughter and the lesser included offense of criminally negligent homicide. The charge instructed the jury that "a person commits the offense of manslaughter if he recklessly causes the death of an individual." With respect to recklessness, the charge states that:

> A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise as viewed from the Defendant's standpoint.

The charge further stated:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 4th day of August, 2020, in Fort Bend County, Texas, [Baker] did then and there unlawfully, recklessly cause the death of J.B. . . . by failing to control speed, following too closely, not using proper emergency devices, and not properly restraining [J.B.], while driving his motor vehicle that was occupied by [J.B.] and causing it to collide with another motor vehicle, then you will find [Baker] guilty of manslaughter, as charged in the indictment.

The jury was instructed that unless they found from the evidence beyond a reasonable doubt, or if they had a reasonable doubt thereof, or were unable to agree, they were to consider whether Baker was guilty of the lesser offense of criminally negligent homicide. The charge provided that a "person commits the offense of

criminally negligent homicide if he causes the death of an individual by criminal negligence." It stated:

> A person acts with "criminal negligence," or is "criminally negligent" with respect to the result of his conduct, when he ought to be aware of a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise as viewed from the Defendant's standpoint.
>
> Therefore, if you find from the evidence beyond a reasonable doubt that on or about the 4th day of August, 2020, in Fort Bend County, Texas, the Defendant, Rickel Tonio Baker, Jr., did then and there unlawfully, with criminal negligence cause the death of J.B., a minor child and hereafter called the Complainant, by failing to control speed, following too closely, not using proper emergency devices, and not properly restraining Complainant, while driving his motor vehicle that was occupied by the Complainant and causing it to collide with another motor vehicle, then you will find the defendant guilty of criminally negligent homicide.

The jury was charged on the law of concurrent causation. The abstract and application paragraphs of the charge stated:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.
>
> Therefore if you find from the evidence beyond a reasonable doubt that the death of J.B., a minor child, would not have occurred but for [Baker's] conduct, as charged in the indictment, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient, you will find [Baker] criminally responsible. Unless you so find beyond a reasonable doubt, or if you have a

33

reasonable doubt thereof, then you will find [Baker] not criminally responsible and say by your verdict "Not Guilty."[8]

## H.   Closing Arguments

The State began its closing arguments by discussing the offenses of manslaughter and criminally negligent homicide.  After explaining the definition of recklessness required by the manslaughter charge, the State addressed the concurrent causation portion of the charge:

> Further, I want to discuss the criminal responsibility part of this charge. I anticipate that there might be some arguments from Defense counsel that this crash was Daniel Hurtado's fault.  But what you've heard from the witnesses before you that anybody could have been Daniel Hurtado that day.  This crash was unavoidable.
>
> A person's criminally responsible unless there's a completely different cause that would have taken away the responsibility of that person, unless there was -- Daniel Hurtado being the sole reason of this crash.
>
> But what we heard is that he wasn't. What we heard was that it was the defendant's recklessness that was the reason for this crash.
>
> Also I want to bring to your attention that there are four different ways that we've alleged that the defendant was reckless.  Okay?  And it's important for you understand that you don't have to agree on all four. You can agree on a combination.  You can agree it was all four or you can agree it was two.  You can agree it was three.  You can agree it was one.
>
> But the important thing is that you're agreeing that there was reckless conduct.

---

[8]   The jury charge also contained a special issue asking the jury to determine whether Baker used or exhibited a deadly weapon, namely a motor vehicle, in the commission of the offense, but only if they first found Baker guilty of manslaughter or criminally negligent homicide.

Referring to a Russian roulette example the State gave the jury during voir dire to illustrate the issue of recklessness, the State argued:

> Every single act that is alleged as recklessness in this case is another bullet in that chamber. The moment the defendant put his kids in that car without a car seat, bullet in the chamber.
>
> The moment he decided to get on the Fort Bend County Tollway where the speed limit is 65 and do[es] 18 miles an hour in a moving lane, another bullet in the chamber.
>
> The moment he decided to put the kids in the car without the car seats, get on the toll road doing 18, and not use his hazards, another bullet in the chamber.
>
> The moment he decides to put the kids in the car seat without the car - - or put the kids in the car without the car seats, get on the tollway doing 18, no hazard lights, and following too closely to his sister, another bullet in the chamber.
>
> Four bullets in this chamber, Russian roulette -- playing Russian roulette with his kids' lives that day, and he lost. It's not him that lost. It was [J.B.]
>
> You heard from the witnesses today -- or throughout this trial that any of those acts on its own could have caused that death, but we have four. And I submit to you that we've proven all four of those beyond a reasonable doubt.
>
> . . .
>
> We all know that every single thing that [Baker] did was reckless. And we know that because of his decision he is guilty of the very sad manslaughter of [J.B.].

In his closing, Baker's counsel began by discussing recklessness:

> Now, in the jury charge it talks about Mr. Baker's conduct. Was he aware of and did he consciously disregard a substantial and

35

unjustifiable risk that his son would die?  Was that -- was what he did a gross deviation as viewed from Mr. Baker's standpoint?

Baker's counsel argued the jury needed to "look[] at the charges here from the standpoint of Mr. Baker" when assessing whether he was reckless.  Counsel also discussed the circumstances leading up to collision, which he described as an "emergency situation."  Among other things, counsel argued that Baker was only driving on the toll road that day because he was following his sister to the tire shop, Carolyn had chosen the route, there is no evidence Baker knew Carolyn's speed would be restricted, and Baker was driving in the "right-hand slow lane" with his hazard lights on.  He also argued there was no evidence Baker knew "Hurtado was coming from behind him in a 20,000-pound commercial motor vehicle, cruise control speeding; distracted by his two loads and probably on his phone and in broad daylight smashing in the back of the Cruz[e]."

With respect to the manners and means by which Baker was alleged to have been reckless, Baker's counsel stated the State was "alleging that Mr. Baker did all four of these things at the same time together."  The State objected to this statement as a misstatement of the law and the court sustained the objection.  Baker's counsel continued, "When you read the charge it says he was -- the controlling speed, following too closely, not using emergency devices, and no[] proper restraint.  So it says 'and.' They're saying it's all four together."  The State also objected to this

36

statement as misstatement of the law and the court sustained the objection.[9] When

he argued that based on the State's charge, the State had to "prove that [Baker]

caused his car to make contact with the truck that rear-ended him, the State objected,

and the trial court sustained the objection.

> Baker's counsel further argued:
>
> Now, the State has to prove their case beyond a reasonable doubt. In their -- in terms of the speeding and the following close and the emergency devices, that all has to do with who caused the crash.
>
> Now, following too close, y'all heard from Deputy Musil and Deputy Garret who testified [Baker] wasn't following too close.
>
> . . . .
>
> Flashers. Not only did the State not prove beyond a reasonable doubt that he didn't have them on, we proved to y'all they were on. I think we proved that to y'all. We don't have any burden of proof. That's our law in our country.
>
> Cross off the flashers. That's two down.

Defense counsel also argued the jury could "cross off the list speeding" because the

"only evidence y'all heard about Mr. Hurtado was that he was speeding and that was

a contributing factor of this crash."

---

[9]     Although the charge listed the alleged manners and means in the conjunctive, Baker and the State agreed at oral argument that the charge should be evaluated as though it was submitted in the disjunctive because it was explained to the jury during closing arguments that they did not have to find all four manners and means to find Baker guilty of manslaughter.

37

Baker's counsel then discussed the fourth manner and means alleged by the State, the lack of proper restraints.

> This one's a little more difficult. And on page -- of your charge, ladies and gentlemen -- 3, it says -- I wrote those words in there, restraint. Okay?
>
> So this says: A person -- a person is criminally responsible if the result would not have occurred but for his conduct. At this point, you know, I'm only talking about the restraints because I don't think we even get here for the other three charges causing the crash.
>
> So here we're talking about the lack of restraint. What is the conduct that's been charged? It's lack of restraint.
>
> . . . .
>
> So they have to prove beyond a reasonable doubt that no proper restraints is a cause of the death. A person is criminally responsible if the result – that's the death -- would not have occurred but for his conduct not having the restraint.
>
> So they have to prove beyond a reasonable doubt that if [J.B.] was in a proper restraint his death would not have occurred.

The State objected to this statement as misstatement of the law and the court sustained the objection. Defense counsel stated:

> [A] person is only criminally responsible if the result would not have occurred but for their conduct. So they have the burden beyond a reasonable doubt. The Prosecution brought you no expert witness or any evidence whatsoever that if [J.B.] was in a proper restraint his death would not have occurred.

The State objected to this statement as a misstatement of the law and the court sustained the objection.

With respect to J.B.'s cause of death, Baker's counsel argued that the only witness who testified about J.B.'s cause of death was the medical examiner and her report "told y'all what this case is about, a rear-end truck accident."[10]  According to Baker's counsel, the report determined J.B.'s cause of death was blunt force trauma and the medical examiner testified that each of J.B.'s blunt force trauma injuries was "consistent with the seat crush striking the boy and pushing him backward towards the rear structure of the car."  Counsel reiterated that under the circumstances, Baker's failure to put J.B. in a child safety seat could not have caused his death:

> A seat crushed him back.  A seat slammed into him, blunt force here, blunt force when he gets hit back from the seat collapsing due to truck rear-end strike.  No restraint can protect you when you are crushed like that.
>
> . . . .
>
> His brother [T.B.], who was not restrained and in the same crash survived because his mom's seat did not collapse on him.

Baker's counsel argued:

> A person is criminally responsible if the result would not have occurred but for his conduct.  Number 4, conduct they're charging is a lack of restraint.  The result this is referring to is the death.  Y'all can use your common sense and apply that language.
>
> You can also use your common sense and read plain English, which says: Therefore, if you find from the evidence—it has to be beyond a reasonable doubt—that the death of [J.B.] would not have occurred but for the fact that there was not a proper restraint.

---

[10]    The State objected to this statement as well as being outside the evidence.

39

> Please apply plain English when you're deliberating and decide whether or not any kind of restraint could have saved [J.B.]

Baker's counsel also criticized Lieutenant Garret's investigation and challenged the credibility of the officers and Hurtado.

In its final closing argument, the State argued that Baker had acted recklessly when he "chose to put his children and the mother of his children in a car with no restraints" and his recklessness was compounded by his decisions to drive on the toll road at 18 miles per hour instead of taking a safer road, and not using his hazard lights. The State also discussed the conflicting evidence as to whether the Cruze's hazard lights were on when the crash occurred, and it addressed the other three alleged manners and means:

> We have to base our decision on what we know. So we know that the defendant was doing 18, 19 miles an hour at the time of this crash. We know that is inherently dangerous. We know that child was not in a car seat, either one of them. We know that that is fatal. Right?
>
> You had experts come in here -- medical experts and reconstruction experts come in here and tell you that. The only time they've ever seen fatalities in children are when they're not in a car seat.

The State also explained to the jury that they did not have to find that Baker was reckless by engaging in all four alleged manners and means. The State explained:

> [J]ust want to remind because it's a little unusual, while the Defense wants to sit on this word "and." "And" is how the case is pled.
>
> Cases are always proven in the dy[i]junctive, meaning 'or," which then means what y'all can do is if three or four of y'all believe that the recklessness -- this is what all these different means are for. Right?

If three or four of y'all believe recklessness was failure to control speed and three or four of y'all believe that it was no car seat issue and three or four of y'all believe that it is the lack of the emergency equipment, right, the hazard lights, y'all all can be different in your decision as to how the defendant was reckless. But as long you believe at least one of them beyond a reasonable doubt, we have then proven reckless to you.

And selectively as a group, all you have [to] believe is one thing is reckless and one thing is not, y'all all are unanimous as to the reckless element.

. . . .

So just because you guys might not agree on which part of this crime is reckless, if you believe there is one, then you can be unanimous in believing that there was a reckless act. Okay?

The State then addressed the issue of causation, including whether Hurtado

could have avoided the crash:

Remember what Deputy Musil told us? It doesn't matter what car you're in, whether it's a heavy car or regular car, an SUV, a four-door car, this crash still happens, no matter what.

No matter who was in the driver's seat of that truck and no matter what vehicle that person is driving, it happens. And it happens because of the actions of the defendant, not anybody else.

And if you take the evidence as a whole, we know that the only evidence y'all have is evidence to support that, what happened, in that order, right? We know the truck was doing 67 miles per hour prior to the crash when it went under the gantry camera. We know that Mr. Hurtado slammed on his brakes. We know that he tried to take evasive action to the left. And remember he explained that to us, right?

He told us: As soon as I saw that car, I thought it was stalled out. And when you have a stalled-out car, that means there are pedestrians on the shoulder, and I didn't want to hurt anybody so I steered left.

41

Now, that is -- that is a man who cares and who attempts at every point to be a safe driver, not a person who chooses to put a child unrestrained in the back seat of a car.

Now, I didn't really think this could be accurate until I listened to what Felicia Baker told us. So you guys have seen this wreck. It's bad. It's terrible. It is fatal. Now, remember, [T.B.], Ms. Felicia Baker told us, he suffered really bad injuries. So for the Defense to come up here –

. . . .

For the Defense to come here and try to insinuate or intimate to all of you that [T.B.] is just fine, is just not right. Felicia Baker told you he had a brain injury. He had to learn how to speak again. He broke his legs. He had to learn how to walk again. That's bad. And he lost his little brother because of things his dad.

This wreck is bad. It's horrible. But, you know what, you know who didn't get injured? The people in the front seat. I guess that's a coincidence. I don't know. But we know that someone died in this car.

. . . .

Now, we don't know what caused [J.B.'s] head injuries. We don't. The Medical Examiner told us he had blunt force trauma to the back of the head. So something hit him and/or he hit something. So we don't know if it was in the car, if it was out of the car. You don't. All you know is that's how he died. The Medical Examiner couldn't even tell us if he suffered or not.

The State also addressed briefly whether Baker used a deadly weapon. The

State argued:

As parents we are supposed to protect children. As people in a community we're supposed to protect the future of your community.

The defendant didn't do it. He knew he didn't do it and he didn't care. Those are choices that show you that he knew that there was a risk and he just said: Screw it. I'm going to help my sister change a tire halfway

across town, way more important than making sure my kids are strapped in.

. . . .

What do regular people do when they're in the defendant's position and did the defendant act the same way? We all know the answer to that, right? No. Because regular people are not reckless. Regular people do not put children who need to be in car seats not in car seats.

. . . .

Regular people do not put their own children in danger, do not drive 18 miles an hour on the freeway, do not—make sure they have emergency equipment on, if that actually happened. Of if your car broke down, you turn your flashers on and get on the side of the road. That's what you do. That's what a regular person does. Not a reckless person. Not a person who chooses to disregard what may or may not happen.

That's what a regular person does. Not a reckless person. Not a person who chooses to disregard what may or may not happen.

The State concluded by telling the jury that "the only evidence you have shows us that [Baker] was reckless and his recklessness caused the death of [J.B.]."

On June 17, 2022, the jury acquitted Baker of manslaughter and the lesser included offense of criminally negligent homicide. Ten days later, on June 27, 2022, the State indicted Baker for injury to a child against T.B. (trial court cause number 22-DCR-099972) and it reindicted Baker for aggravated assault against a family member causing serious bodily injury against T.B. (trial court cause number 20-DCR-92879B). The indictment charging Baker with injury to a child against T.B. alleges that that on or about August 4, 2020, Baker

43

> did then and there intentionally, knowingly, or recklessly cause serious bodily injury to [T.B.] … by failing to use proper restraints, operating his vehicle at an unsafe speed, failing to use proper emergency equipment, or by impeding traffic, while driving his motor vehicle that was occupied by [T.B.] and cause it to collide with another motor vehicle.

> did then and there intentionally, knowingly, or recklessly by omission cause serious bodily injury or serious mental deficiency, impairment or injury to [T.B.] … by failing to use proper restraints, operating his vehicle at an unsafe speed, failing to use proper emergency equipment, or by impeding traffic, while driving his motor vehicle that was occupied by [T.B.] and causing it to collide with another motor vehicle, and the defendant had assumed care, custody or control of the child.

And the indictment charging Baker with aggravated assault against a family member causing serious bodily injury against T.B. alleges that on or about August 4, 2020, Baker

> did then and there intentionally, knowingly, or recklessly cause serious bodily injury to [T.B.] by failing to use proper restraints, operating his vehicle at an unsafe speed, failing to use proper emergency equipment, or by impeding traffic, while driving his motor vehicle that was occupied by [T.B.] and causing it to collide with another motor vehicle, and the defendant used a deadly weapon, to-wit: motor vehicle, during the commission of said assault.

### Application for Writ of Habeas Corpus

Baker filed a pretrial application for a writ of habeas corpus in which he argued the doctrine of collateral estoppel embodied in the Fifth Amendment's guarantee against double jeopardy barred the State from prosecuting him for the indicted offenses against T.B. According to Baker, collateral estoppel applies because when the jury acquitted him of manslaughter and criminally negligent

44

homicide in the first trial, the jury "necessarily and rationally concluded [that] Baker did not cause the motor vehicle collision in which he and his family were rear-ended by Hurtado who was driving the 20,000 pound truck-trailer combination," and causation is an essential element of the offenses of injury to a child and aggravated assault with a deadly weapon. While Baker acknowledged that recklessness was also an element the jury had to determine in the manslaughter trial, he argued that recklessness was not "a rational path to acquittal" because the State "focused its case on the issue of who caused the collision." He argued that he never contested the children were not restrained or that he was traveling 18 miles an hour on the toll road. And thus, the "jury simply could not have rationally acquitted [him] on the issue of recklessness."

Baker also argued that the State was estopped or had waived its right to try him for the offenses against T.B. based on the prosecutor's pretrial statement to the trial court during the manslaughter case that it was not "the State's position that we will have two criminal trials. Our intention is to go forward on the criminal trial on the manslaughter . . . We're not asking for a second criminal trial later."

After conducting a hearing on Baker's pretrial application for writ of habeas corpus, the trial court denied relief on the merits. This appeal followed.

## Collateral Estoppel

In his first issue, Baker argues the trial court erred in denying his pretrial application for habeas corpus relief because the jury necessarily decided the issue of causation in his favor, and causation is an essential element of the injury to a child and aggravated assault charges the State now seeks to prosecute against him. According to Baker, the "issue of ultimate fact [the jury decided during the first trial] was a causation decision concerning whether Baker's conduct was clearly insufficient to cause the result and whether Hurtado's conduct was clearly sufficient," and the jury necessarily resolved this issue in Baker's favor. He argues this is the "only rational basis for the jury's decision" to acquit him. Baker argues that the "jury's necessary conclusion that Hurtado's actions were the sole and clear sufficient cause of J.B.'s death, necessarily means that it was also the sole sufficient cause of the injuries to T.B. that the State seeks to relitigate" in a second trial for aggravated assault with a deadly weapon and injury to a child.[11]

The State argues that collateral estoppel is inapplicable because Baker disputed both recklessness and causation at trial and the jury could have acquitted

---

[11] Baker's argument on appeal is somewhat different than the argument he raised in his pretrial application for writ of habeas corpus. In his pretrial application for a writ of habeas corpus, Baker argued that by acquitting him of manslaughter and criminally negligent homicide, the jury necessarily decided that Baker did not cause the motor vehicle collision resulting in J.B.'s death. On appeal, Baker argues the jury necessarily found that his conduct was clearly insufficient, and Hurtado's conduct clearly sufficient, to cause "the result"—J.B.'s death.

46

him on either basis. If there are two bases on which a jury could have reached a verdict, the State argues "collateral estoppel does not bar a subsequent trial." The State also argues that the facts and legal issues from the first trial for manslaughter and criminally negligent homicide are not identical to the facts and legal issues that will be involved in the second trial for aggravated assault and injury to a child in part because the offenses are "result of conduct" offenses for which the required *mens rea* for recklessness differs.[12] The State argues that a "rational jury could have found [Baker] was not reckless in that it could have found he did not perceive a substantial and unjustifiable risk that J.B. would die, and yet still rationally find that he did perceive a substantial and unjustifiable risk that T.B. would sustain serious bodily injury."

## A. Standard of Review

The writ of habeas corpus is an extraordinary remedy. *Ex parte Perry*, 483 S.W.3d 884, 895 (Tex. Crim. App. 2016). A collateral estoppel claim that alleges a

---

[12] There are three categories of criminal offenses: "result of conduct" offenses, "nature of conduct" offenses, and "circumstances of conduct" offenses. *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011). A "result of conduct" offense focuses on the result, regardless of the specific manner used to accomplish the result. *See id.*; *see also Ramos v. State*, 407 S.W.3d 265, 270 (Tex. Crim. App. 2013) (stating "manslaughter is a 'result of conduct' crime where the 'focus' or gravamen is the 'death of the individual'"). The gravamen or focus of a "nature of conduct" offense, however, is the act or conduct itself regardless of any result. *See Young*, 341 S.W.3d at 423. A "circumstances of conduct" offense "prohibit[s] otherwise innocent behavior that becomes criminal only under specific circumstance." *Id.*

47

double jeopardy violation is one of the limited circumstances in which a defendant can seek pretrial habeas relief. *See id.* at 895–96; *see also Ex parte Weise*, 55 S.W.3d 617, 619–20 (Tex. Crim. App. 2001). We review a trial court's ruling on a pretrial application for writ of habeas corpus for abuse of discretion. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); *Ex parte Paxton*, 493 S.W.3d 292, 297 (Tex. App.—Dallas 2016, pet. ref'd). In conducting our review, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's findings of fact supported by the record. *See Ex parte Wheeler*, 203 S.W.3d at 324; *Ex parte Paxton*, 493 S.W.3d at 297. We also defer to the trial court's application of the law to the facts if resolving the ultimate question turns on an evaluation of credibility and demeanor. *Ex parte Paxton*, 493 S.W.3d at 297.

If resolving the ultimate question turns on applying legal standards, we review the trial court's ruling on a pretrial application for a writ of habeas corpus *de novo*. *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007) (recognizing that although "[c]ollateral estoppel deals *only* with specific factual determinations, not legal claims or legal conclusions," de novo review is nevertheless appropriate when "[a] decision to apply collateral estoppel is a question of law, applied to the facts") (emphasis in original) (internal quotations omitted).

48

## B. Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment states that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Embodied within the guarantee against double jeopardy is the principle of collateral estoppel. *Ex parte Adams*, 586 S.W.3d at 4 (citing *Ashe v. Swenson*, 397 U.S. 436, 445 (1970)). Collateral estoppel "stands for an extremely important principle in our adversary system of justice." *Ashe*, 397 U.S. at 443. It "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties." *Id.*

"[C]ollateral estoppel requires that the precise fact[s] litigated in the first prosecution have arisen in the same transaction, occurrence, situation, or criminal episode that gave rise to the second prosecution." *Murphy v. State*, 239 S.W.3d 791, 795 (Tex. Crim. App. 2007). When assessing whether collateral estoppel applies to bar a subsequent criminal trial, courts must first ascertain what facts were necessarily decided in the first proceeding and then determine whether those necessarily-decided facts constitute essential elements of the charged offense in the second trial. *Ex parte Rion*, 662 S.W.3d 890, 896 (Tex. Crim. App. 2022); *see also Ex parte Watkins*, 73 S.W.3d 264, 268 (Tex. Crim. App. 2002) ("Before collateral estoppel will apply to bar relitigation of a discrete fact, that fact must necessarily have been decided in

49

favor of the defendant in the first trial."). "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding," taking into account the pleadings, evidence, jury charge, arguments of counsel, and other relevant matters, "and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 443 ("The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceeding") (internal quotation marks omitted); *see also Ex parte Rion*, 662 S.W.3d at 896–97 (same); *Ex parte Taylor*, 101 S.W.3d 434, 442 (Tex. 2002) ("Generally, then, the scope of the facts that were actually litigated determines the scope of the factual finding covered by collateral estoppel."); *Ex parte Watkins*, 73 S.W.3d at 268 ("In applying the doctrine of collateral estoppel, courts must first determine whether the jury determined a specific fact, and if so, how broad—in terms of time, space and content—was the scope of its finding.").

For collateral estoppel to apply, a court must conclude that "it would have been irrational for the jury to acquit in the first trial without finding in the defendant's favor on a fact essential to a conviction in the second." *Ex parte Rion*, 662 S.W.3d at 897 (internal quotation marks omitted). Collateral estoppel is restricted to cases in which the legal and factual situations are identical. *Id.* "[T]here are no hard and fast rules concerning which factual issues are legally identical and thus barred from

50

relitigation in a second criminal proceeding." *Ex parte Taylor*, 101 S.W.3d 434, 442 (Tex. Crim. App. 2002) ("If an ordinary person would expostulate, 'But that's a different issue,' probably it is.") (quoting 18 WRIGHT, MILLER & COOPER, 24 § 4417 at 440).

Collateral estoppel does not preclude a second prosecution simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question. *Ex parte Richardson*, 664 S.W.3d 141, 143 (Tex. Crim. App. 2022). The mere possibility that a fact may have been previously determined is insufficient to bar re-litigation of that same fact in a second trial. *Ex parte Watkins*, 73 S.W.3d at 268. A fact is not necessarily decided if the jury could have acquitted the defendant on a different basis. *See Ex parte Rion*, 662 S.W.3d at 898 (stating "if the jury could have acquitted [the defendant of manslaughter] based on either [recklessness or causation] then collateral estoppel would not apply"). The defendant has the difficult burden to establish that the facts at issue in the second trial were necessarily decided in his favor in the first trial. *Murphy*, 239 S.W.3d at 795; *see also Ex parte Adams*, 586 S.W.3d at 5; *Stone v. State*, 635 S.W.3d 763, 774 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (recognizing collateral estoppel "test is demanding").

When deciding whether collateral estoppel applies, courts must avoid taking a "hypertechnical and archaic approach," and instead apply the test "with realism and rationality." *Id.* at 444. As the Supreme Court emphasized in *Ashe*,

> The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

397 U.S. at 444; *see also Murphy*, 239 S.W.3d at 794–95 (quoting *Ashe*, 397 U.S. at 444).

## C.   Manslaughter - Recklessness and Causation

Article 19.04 of the Texas Penal Code provides that a person commits the offense of manslaughter "if he recklessly causes the death of an individual." TEX. PENAL CODE § 19.04(a). To convict Baker of manslaughter, the State thus had to prove that Baker recklessly caused the death of J.B.

A person acts "recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* Section 6.04(a) of the Texas Penal Code, which defines

52

causation for purposes of criminal responsibility, states that "a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *See id.* § 6.04(a).[13]

To convict a defendant of manslaughter, the State must prove the existence of a "but for" causal connection between the defendant's reckless conduct and the result—the complainant's death. *See Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986) ("Under § 6.04(a) a 'but for' causal connection must be established between the defendant's conduct and the resulting harm."). If there is more than one "but for" cause of the complainant's death, the defendant is still criminally responsible if (1) his conduct was sufficient by itself to have caused the complainant's death, or (2) the defendant's conduct and the other cause together were sufficient to have caused the complainant's death. *See Robbins*, 717 S.W.2d at 351 (citing TEX. PENAL CODE § 6.04(a)); *Cyr v. State*, 665 S.W.3d 551, 557 (Tex. Crim. App. 2022) ("Where two or more causes satisfy 'but for' causation, a criminal defendant remains liable if her conduct was either sufficient to have caused the result alone 'regardless of the existence of a concurrent cause,' or both causes '*together*'

---

[13] "Another cause" is one in addition to the actor's conduct, "an agency in addition to the actor." *Cyr*, 665 S.W.3d at 557 (quoting *Robbins*, 717 S.W.2d at 351 n.2).

53

were sufficient to cause the result.") (quoting *Robbins*, 717 S.W.2d at 351 (emphasis in original)). A defendant is not criminally responsible if another "but for" cause was clearly sufficient by itself to cause the complainant's death and the defendant's conduct by itself was clearly insufficient. *Robbins*, 717 S.W.2d at 351.

The Court of Criminal Appeals has explained the concept of concurrent causation:

> To illustrate: Two arsonists each light fire to the same house, one on the east side and one on the west side, both of which are independently sufficient to burn the house to the ground. Neither arsonist is entitled to an instruction on concurrent causation and both are criminally liable. The same result is reached if both fires would independently be insufficient to burn the house to the ground, but the combined force of the east fire and the west fire causes such a result. Only where the east arsonist can produce evidence that his fire was clearly insufficient to burn the house to the ground, and the west arsonist's clearly sufficient acting alone, would the east arsonist be entitled to an instruction on concurrent causation and potentially escape liability for the full extent of the damage caused under concurrent causation.

*Cyr*, 665 S.W.3d at 557.

**D. Analysis**

Baker argues that collateral estoppel applies and bars the State from prosecuting him for aggravated assault and injury to a child against T.B. because the jury in his manslaughter trial necessarily decided the issue of causation in his favor, and causation is essential to a conviction for aggravated assault and injury to a child against T.B. According to Baker, "the jury necessarily had to have decided that [his] conduct was clearly insufficient to have caused the result and Hurtado's conduct was

54

clearly sufficient to have caused the result," and this "is the only rational basis for the jury's decision" to acquit him. Baker argues that the focus of his manslaughter trial was on the issue of causation and that although "the defense challenged the alleged manner and means alleged in the indictment," it did so "to demonstrate that [his] alleged actions were clearly insufficient to cause the result and Hurtado's actions were clearly sufficient." In other words, Baker argues that causation was the primary issue in his manslaughter trial, and to the extent the issue of recklessness was before the jury, the jury could not rationally have acquitted him on that basis.

Relying on the Court of Criminal Appeals opinion in *Ex parte Rion*, the State argues that collateral estoppel does not apply in this case because Baker disputed both recklessness and causation at trial and the jury could have acquitted him on either ground. *See Ex parte Rion*, 662 S.W.3d at 898 (stating "the State had to prove both causation and recklessness for the jury to convict Appellant, and it is true that if the jury could have acquitted based on either of those grounds then collateral estoppel would not apply"). According to the State, the jury in Baker's manslaughter trial could have found that Baker did not have the required *mens rea* because he did not perceive a substantial and unjustifiable risk that J.B. would die as a result of his conduct, and thus acquitted Baker of manslaughter on this basis.

In *Ex parte Rion*, the Court of Criminal Appeals held that collateral estoppel did not bar the State from prosecuting Rion for aggravated assault following his

acquittal for the offense of manslaughter arising from the same car collision. *Ex parte Rion*, 662 S.W.3d at 898. Rion, who drove his car seventy-one miles per hour in a forty-mile-per-hour zone, lost control of his car causing it to cross the median and strike an SUV driven by Claudia Loehr. Loehr was seriously injured in the collision and Parnell, a passenger in the SUV, sustained life-threatening injuries and died four days later. Rion was charged with manslaughter for Parnell's death and aggravated assault with a deadly weapon for Loehr's injuries. *Id*. at 893. Rion moved to consolidate both cases into a single trial, but the motion was opposed by the State and denied by the trial court. *Id.* Rion's defensive theory at his manslaughter trial was that he had a mental break when he was driving, and thus he lacked the requisite *mens rea* for manslaughter. In other words, Rion was not reckless by driving thirty miles per hour over the speed limit and losing control of his vehicle causing it to cross the median because, due to his altered mental state, he did not consciously disregard a substantial and unjustified risk that such conduct would result in someone's death. *Id*. at 896. The jury acquitted Rion of manslaughter and the lesser included offense of criminally negligent homicide. Subsequently, the State sought to prosecute Rion for aggravated assault with a deadly weapon based on Loehr's injuries. Rion filed a pretrial application for writ of habeas corpus arguing that collateral estoppel prohibited the State from prosecuting him for

56

aggravated assault because the first jury necessarily had decided that Rion had not acted recklessly. *Id.* The trial court denied Rion's application. *Id.*

On appeal, the State argued collateral estoppel did not apply because, among other reasons, the jury could have acquitted Rion based on causation and not recklessness, thus the jury had not necessarily decided the issue of recklessness in Rion's favor. *Id.* at 897. The court explained that "the State had to prove both causation and recklessness for the jury to convict" Rion of manslaughter and "if the jury could have acquitted based on either [causation or recklessness] then collateral estoppel would not apply." *Id.* at 898. The court concluded, however, that the "jury's not guilty verdict could not have been rationally based on a finding that [Rion had] not cause[d] the accident or that Parnell's death was not caused by the accident" because "the defense did not attempt to dispute that [Rion] caused the accident or that Parnell dies as a result," and thus the jury had not necessarily decided the issue of causation in favor of Rion and acquitted him on that basis. *See id.* at 899. In reaching this conclusion, the court observed that Rion had not disputed he caused the crash or that Parnell died as a result. Rather, Rion expressed remorse to Parnell's family during his testimony and through his statements, the court determined, Rion "took responsibility" for causing the accident that resulted in Parnell's death. *Id.* at 899. The court noted that the testimony from Rion's witnesses did not raise any questions of causation and Rion's counsel did not attempt to elicit any testimony on

cross-examination of the State's witnesses regarding whether Rion caused the crash or whether the crash caused Parnell's death. The court also remarked that the State's closing argument was focused on recklessness. The court noted that the State understood that recklessness was the primary issue for the jury to decide, not causation, because the State had brought up the issue of causation only once during 20 pages of argument. *See id.* 899 ("The lack of argument regarding causation indicates the State was not concerned that the jury would acquit Appellant on a finding that the State failed to prove that element."). In its closing argument, the defense acknowledged that Rion had caused the crash and, like the State, focused on the issue of recklessness. The defense reiterated its theory that the accident occurred when Rion had a mental break, and argued the State had not presented any evidence Rion was aware of and consciously disregarded a risk that someone would die as a result of his conduct. *Id.* at 895–96.

Although the Court of Criminal Appeals concluded that the jury necessarily had decided facts in favor of Rion as to recklessness in the manslaughter trial, the court nonetheless concluded that collateral estoppel was inapplicable because the facts necessarily decided in Rion's manslaughter trial as to recklessness, including whether Rion had the *mens rea* required to convict him of manslaughter for Parnell's death, were not facts essential for a conviction in the second trial for aggravated assault with a deadly weapon involving Loehr's injuries, because the required mental

states for the offenses are not the same. *See id.* at 900–01. The court explained that the offenses of manslaughter, assault, and aggravated assault are "result of conduct" offenses. *See id.* at 900. To convict Rion of manslaughter, the jury thus had to find that Rion was aware of a risk that *death* would occur as result of his conduct, whereas the jury in the second trial for aggravated assault with a deadly weapon would have to find that Rion was aware of a substantial and unjustifiable risk that *bodily injury* would occur as result of his conduct. *See id.* at 900–01. Because the recklessness issues in the two trials were "not precisely the same," collateral estoppel did not apply. *Id.* at 901.

Baker argues that *Ex parte Rion* is materially different because in the manslaughter case, "all of the methods alleged to be reckless or negligent were hotly disputed" and the case had "substantial evidence that the actual cause of death was the result of Hurtado's manner and circumstance of driving." He also argues that the jury was instructed that it was "required to find Baker not guilty it if concluded that, or had a reasonably doubt about, whether Hurtado's actions were clearly sufficient to cause the result and Baker's actions were clearly insufficient." And while "recklessly or negligently causing death may be different than recklessly or negligently causing injury in some circumstances," Baker argues "the opposite is true in the instant case because the jury's necessary conclusion that Hurtado's actions were the sole and clear sufficient cause of J.B.'s death, necessarily means

59

that it was also the also the sole sufficient cause of the injuries to T.B.—an issue he argues the State seeks to "relitigate" in a second trial.

The fatal flaw in Baker's analysis is that his argument presupposes that the only issue the jury considered or the only rational basis on which the jury could have acquitted him of manslaughter in the first trial is causation. Based on our review of the entire record, we do not reach that same conclusion. The issues of causation and recklessness both were present throughout Baker's manslaughter trial, from opening statements to closing arguments. Although Baker's main defensive theory was that Hurtado caused the crash, and most of the arguments and testimony presented at trial concerned whether Baker or Hurtado caused the crash that resulted in J.B.'s death, and whether Baker could be held criminally responsible for J.B.'s death under concurrent causation, Baker acknowledges that he disputed both recklessness and causation at trial and that "all of the methods alleged to be reckless or negligent were hotly disputed." Indeed, in his closing, Baker's counsel began by discussing recklessness:

> Now, in the jury charge it talks about Mr. Baker's conduct. Was he aware of and did he consciously disregard a substantial and unjustifiable risk that his son would die? Was that -- was what he did a gross deviation as viewed from Mr. Baker's standpoint?

Baker's counsel argued that the jury needed to "look[] at the charges here from the standpoint of Mr. Baker" when assessing whether he was reckless.

60

The record also reflects that the State, which discussed both recklessness and causation in its opening statement, presented testimony supporting all four alleged manners and means of recklessness and expert testimony that Baker's recklessness had caused the crash that resulted in J.B.'s death. Baker's counsel also elicited testimony regarding recklessness and causation on direct and cross examination. Among other testimony regarding recklessness, Deputy Musil testified that every licensed Texas driver has the Texas Driver's Handbook and the handbook instructs drivers that in the event of a breakdown, the driver should activate his emergency flashers and move off the edge of the roadway. According to Deputy Musil, "failing to activate your emergency equipment in situations when you're going dangerously slow" is "reckless behavior" capable of causing serious injury or death. He also testified that based on the video taken at the toll plaza, Baker had not activated the Cruze's hazard lights prior to the crash. On cross-examination, Deputy Musil testified that a driver may drive at a reduced speed if a special hazard exists, but he disagreed with Baker's counsel that a special hazard existed that allowed Baker to drive 18 miles an hour on the tollway.

Although his testimony pertained primarily to the issue of causation, Lieutenant Garret also testified that the Cruze was traveling 18-19 miles per hour which is a "a very unsafe speed" and "equally dangerous" as driving 105 miles per hour. Lieutenant Garret also testified that he had inspected one of the bulbs from

the Cruze and he determined that the Cruze's hazard lights were not on when the crash occurred. According to Lieutenant Garrett, Baker should have been using his hazard lights when he was driving on the tollway, and if he had, it would have given Hurtado "extra time to observe" the slow-moving Cruze.

On cross-examination, Baker's counsel also questioned Lieutenant Garret at length about the light bulb he obtained from the Cruze and the basis of his conclusion that the Cruze's hazard lights were not activated when the crash occurred. Erwin, Baker's accident reconstruction expert, also testified extensively about whether Baker had activated the Cruze's hazard lights. Erwin testified that contrary to Lieutenant Garret's testimony, Baker had activated the Cruze's hazard lights prior to the crash. According to Erwin, the light bulb Lieutenant Garret obtained from the Cruze was not a hazard light, and thus provided no evidence that the hazard lights were not in use prior to the crash. Erwin also testified that he reviewed the video taken by the toll plaza's cameras and the video showed the Cruze's hazard lights were activated when it drove past the toll plaza. Ervin also discussed Baker's decision to drive at a reduced speed in the right lane, as opposed to driving on the shoulder of the road, in light of Texas law.

In its closing argument, the State discussed the evidence of the four alleged manners and means of recklessness and argued that Baker had engaged in each alleged act. The State also argued that Baker, alone, was responsible for causing the

crash and that there was nothing Hurtado could have done to avoid striking the back of the Cruze. While Baker's closing argument focused on the issue of causation, the defense also discussed the manners and means of recklessness and argued that Baker had not followed too closely, had not failed to activate the Cruze's hazard lights, and had not failed to control his speed. Baker did not dispute that he had failed to restrain J.B. in the backseat of the Cruze. Rather, the defense argued that Baker's failure to restrain J.B. had not caused J.B.'s death. Thus, while causation may have been a heavily litigated issue at Baker's manslaughter trial, the issue of Baker's recklessness was also put before the jury.

Baker bore the difficult burden of proving the jury necessarily decided the fact of causation in his favor at the manslaughter trial and acquitted him on that basis. *Murphy*, 239 S.W.3d at 795; *see also Ex parte Adams*, 586 S.W.3d at 5; *Stone*, 635 S.W.3d at 774 (recognizing collateral estoppel "test is demanding"). A fact is not necessarily decided if the jury could have acquitted the defendant on a different basis. *See Ex parte Rion*, 662 S.W.3d at 898 (stating "if the jury could have acquitted [the defendant of manslaughter] based on either [recklessness or causation] then collateral estoppel would not apply"). Even if it is highly unlikely that the jury would have acquitted Baker absent a finding of causation in his favor (in other words, finding he did not cause J.B.'s death), this is not enough to render the doctrine of collateral estoppel applicable. Collateral estoppel does not preclude a second

prosecution simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question. *Ex parte Richardson*, 664 S.W.3d at 143 (stating collateral estoppel does not preclude second prosecution when it is every unlikely original jury acquitted defendant without finding fact in question).

Given the conflicting evidence in the record as to whether Baker engaged in the alleged manners and means, the extensive trial testimony regarding recklessness, and the arguments of counsel, including whether Baker had the required *mens rea* for manslaughter, the jury could have found that Baker was not reckless, and rationally acquitted him on that basis. We thus cannot say it would have been irrational for the jury to acquit Baker of manslaughter without finding in favor of Baker on the issue of causation.

Moreover, even if we conclude that the jury necessarily found that Baker's conduct was clearly insufficient to cause J.B.'s death and Hurtado's conduct was clearly sufficient to cause his death, as Baker argues, that does not end the inquiry. Collateral estoppel does not apply unless we also conclude that the facts decided in the first trial are essential to convict Baker of aggravated assault causing serious bodily injury and injury to a child with regard to T.B. in a second trial *See Ex parte Rion*, 662 S.W.3d at 896 (stating collateral estoppel applies when fact necessarily decided in defendant's favor in first trial are essential to conviction in second trial).

According to Baker, the "jury's necessary conclusion that Hurtado's actions were the sole and clear sufficient cause of J.B.'s death, necessarily means that it was also the sole sufficient cause of the injuries to T.B. that the State seeks to relitigate" in a second trial for aggravated assault with a deadly weapon and injury to a child. Relying on *Ex parte Rion*, the State argues that it is not barred by collateral estoppel from trying Baker for aggravated assault with a deadly weapon and injury to a child against T.B. because the facts and legal issues to be litigated for those offenses are not identical to the facts and legal issues litigated in the first trial for manslaughter.

Baker alleges that his conduct, Hurtado's conduct, and the facts surrounding the collision will be the same in both trials. But the critical difference is that in the manslaughter case, the question was whether Baker was criminally responsible for J.B.'s death, and the question in the aggravated assault and injury to a child trial will be whether Baker is criminally responsible for T.B.'s injuries. *See id.* at 900 (stating manslaughter, assault causing bodily injury, and aggravated assault causing bodily injury are "result of conduct" offenses and gravamen of assault and aggravated assault offense is bodily injury); *see also Ramos v. State*, 407 S.W.3d 265, 270 (Tex. Crim. App. 2013) (stating "manslaughter is a 'result of conduct' crime where the 'focus' or gravamen is the 'death of the individual'"); *Pizzo v. State*, 235 S.W.3d 711, 717 (Tex. Crim. App. 2007) (indicting injury to a child is result of conduct offense). Although the State had the burden of proving that Baker caused the result

in the first manslaughter trial and will bear the same burden in the second trial for aggravated assault and injury to a child, the results of Baker's conduct, or omissions, are different and thus the legal issue of causation is different. *See* TEX. PENAL CODE § 19.04(a) (stating person commits offense of manslaughter "if he recklessly causes the death of an individual"); *id.* § 22.01(a)(1) (stating person commits assault if person "intentionally, knowingly, or recklessly causes bodily injury"); *id.* § 22.02(a)(1) (stating person commits aggravated assault "if the person commits assault as defined in § 22.01" and "causes serious bodily injury to another"); *id.* § 22.04(a)(1) (stating person commits injury to a child if person "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child. . . serious bodily injury"). Whereas the State had to prove in the manslaughter trial that Baker's conduct caused J.B.'s death, the State would have to prove in the second trial that the same conduct caused T.B.'s injuries. *See* TEX. PENAL CODE §§ 19.04(a) (manslaughter), 22.01(a)(1) (assault causing bodily injury); *id.* § 22.02(a)(1) (aggravated assault causing serious bodily injury); *id.* § 22.04(a)(1) (injury to a child).

There are also significant factual differences involving J.B. and T.B. at the time of the collision, including their location in the Cruze when the accident occurred and the extent of the injuries each child sustained due to the collision. Although both J.B. and T.B. were sitting unrestrained in the backseat of the Cruze, J.B., who

66

died in the collision, sat directly behind the driver's seat and T.B. sat directly behind the front passenger seat. The record reflects that, unlike the front passenger seat, the driver's seat collapsed backwards during the collision, striking or crushing J.B. T.B., who was sitting directly behind the passenger seat, sustained serious, but less severe, injuries than J.B., even though the passenger side of the car where T.B. was sitting sustained more damage than the driver's side of the car where J.B. had been sitting.

According to Baker, "while recklessly or negligently causing death may be different than recklessly or negligently causing injury in some circumstances, the opposite is true in the instant case because the jury's necessary conclusion that Hurtado's actions were the sole and clear sufficient cause of JB's death, necessarily means that it was also the sole sufficient cause of the injuries to TB that the State seeks to relitigate" in the second trial for aggravated assault causing serious bodily injury and injury to a child. In other words, Baker argues that the jury necessarily found that Hurtado's conduct was "clearly sufficient to produce the result [T.B.'s injuries] and the conduct of [Baker] clearly insufficient" to produce T.B.'s injuries. *See generally* TEX. PENAL CODE § 6.04(a) (stating "a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient").

67

We disagree that the jury in the first trial necessarily found that Hurtado's conduct was "the sole sufficient cause of the injuries to TB," as Baker argues. Even if the jury had found that Baker's conduct was clearly insufficient to cause J.B.'s death and Hurtado's conduct was clearly sufficient to cause his death, and thus "Hurtado's actions were the sole and clear sufficient cause of JB's death," this does not necessarily mean that Hurtado's conduct was the *only* sufficient cause of T.B.'s less severe injuries, as Baker argues. While such a finding may suggest that Hurtado's conduct was clearly sufficient to cause T.B.'s less severe injuries, it says nothing about the sufficiency of Baker's conduct. Conduct by Baker that is insufficient on its own to cause J.B.'s death, may nevertheless be sufficient to cause T.B.'s less severe bodily injuries, particularly under the facts presented here. *See generally Ex parte Rion*, at 901 (observing death is "the ultimate form of bodily injury"). In other words, a jury could find that Hurtado's conduct and Baker's conduct were both sufficient to cause T.B.'s less severe bodily injuries, and under such circumstances, Baker would be criminally responsible for T.B.'s injuries. *See generally* TEX. PENAL CODE § 6.04(a) (stating "a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient").

In light of the differences in the severity of T.B.'s and J.B.'s injuries and the facts surrounding their injuries, including their locations in the Cruze, the extent of damage to the car where the children were seated, and the fact that the driver's seat collapsed on J.B., whereas the passenger seat did not collapse on T.B., we conclude that while Baker's first trial for manslaughter against J.B. and his second trial for aggravated assault and injury to a child against T.B. would, as Baker argues, involve "all of the same witnesses and arguments," the legal and factual issues in the two trials are "not precisely the same." *Ex parte Rion*, 662 S.W.3d at 901; *see also Ex parte Taylor*, 101 S.W.3d at 442 ("If an ordinary person would expostulate, 'But that's a different issue,' probably it is.") (internal quotations omitted).

The doctrine of collateral estoppel thus does not bar the State from prosecuting Baker for aggravated assault and injury to child against T.B. because the legal and factual issues to be decided in the second trial are not precisely the same as the legal and factual issues litigated in Baker's manslaughter trial. *See Murphy*, 239 S.W.3d at 795 (stating "collateral estoppel requires that the precise fact[s] litigated in the first prosecution have arisen in the same transaction, occurrence, situation, or criminal episode that gave rise to the second prosecution"); *Ex parte Watkins*, 73 S.W.3d at 268 ("Before collateral estoppel will apply to bar relitigation of a discrete fact, that fact must necessarily have been decided in favor of the defendant in the first trial.").

We thus hold that because the jury could have acquitted Baker of manslaughter based on either recklessness or causation, collateral estoppel does not apply. Furthermore, even if the jury had resolved the issue of causation in Baker's favor by finding that although Baker was reckless, Baker's conduct was clearly insufficient to cause J.B.'s death and Hurtado's conduct was clearly sufficient to cause his death, collateral estoppel still would not apply because whether Baker's conduct was clearly insufficient to cause J.B.'s death and Hurtado's conduct was clearly sufficient to cause his death are not facts essential to convict Baker of aggravated assault causing serious bodily injury and injury to a child with regard to T.B.

Baker bore the difficult burden of proving that the jury necessarily decided a fact in his favor at the manslaughter trial that is essential for a conviction for the offenses for which the State intends to prosecute him in the second trial. *Murphy*, 239 S.W.3d at 795; *see also Stone*, 635 S.W.3d at 774 (recognizing collateral estoppel "test is demanding"). Because Baker did not meet his difficult burden of proving that collateral estoppel applies, the trial court did not err by denying his pretrial application for a writ of habeas corpus. *See id.*

We overrule Baker's first issue.

**Estoppel or Waiver of Right to Try Baker for Offense Against T.B.**

In his second issue, Baker argues that the State is estopped or has waived its right to try Baker for the offenses of aggravated assault causing serious bodily injury and injury to a child based on the acceptance of benefits doctrine. According to Baker, the State elected to try him on the manslaughter offense against J.B. only and refused to proceed to trial on all other pending offenses against T.B., as Baker requested. Relying on a statement the prosecutor made during a pretrial hearing in the manslaughter trial, Baker argues the State "accepted the benefits of a single trial by representing to the trial court that there would not be a second trial as its argument for obtaining the benefit of not having to try the aggravated assault case and manslaughter case together." In his pretrial application for writ of habeas corpus, however, Baker argued that the State was barred from trying him for the offenses of aggravated assault causing serious bodily injury and injury to a child against T.B. because the State had judicially admitted that it would only try Baker once.

To preserve error, Texas Rule of Appellate Procedure 33.1(a) requires a complaining party to make a specific objection or complaint and obtain a ruling on it before the trial court. *See* TEX. R. APP. P. 33.1(a); *see also Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Ex parte James*, Nos. 01-05-00282-CR, 01-05-00480-CR to 01-05-00485-CR, 2005 WL 1540791, at *3 (Tex. App.— Houston [1st Dist.] June 30, 2015, no pet.) (mem. op., not designated for publication)

("[A]ppellant did not preserve th[e] issue for [appellate] review because he did not raise th[e] complaint to the [trial] court in his applications for writs of habeas corpus or at the hearing."). And issues on appeal must track the arguments made in the trial court. *See Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd); *see also Ex parte Letizia*, No. 01-16-00808-CR, 2019 WL 610719, at *4 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, pet. ref'd) (mem. op., not designated for publication) (holding appellant did not preserve argument for appellate review because he did not raise it in trial court in his application for writ of habeas corpus). "Where a trial [complaint] does not comport with the issue raised on appeal, [an] appellant . . . preserve[s] nothing for review." *Wright*, 154 S.W.3d at 241; *see also Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (stating appellate court should not address merits of issue not preserved for appeal); *Ex parte Evans*, 410 S.W.3d at 485 (declining to consider argument applicant did not raise in application for writ of habeas corpus in trial court). Because Baker did not argue in his application for a writ of habeas corpus that the acceptance of benefits doctrine barred the State from trying him for aggravated assault causing serious bodily injury and injury to a child against T.B., we hold Baker did not preserve his second issue for our review. *See* Tex. R. App. P. 33.1(a); *Ex parte Perez*, 536 S.W.3d 877, 880 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("In reviewing an order denying habeas relief, an intermediate court of appeals only reviews issues that were properly raised

72

in the habeas petition and addressed by the trial court."); *Ex parte Bui*, 983 S.W.2d 73, 76 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd).

And even had he preserved the issue for review, Baker would not prevail. Section 3.02(a) of the Texas Penal Code states that a criminal defendant "may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode." TEX. PENAL CODE § 3.02(a). A defendant, however, "does *not* have a right to consolidate offenses committed in the same criminal episode." *Nelson v. State*, 846 S.W.2d 496, 498 (Tex. Crim. App. 1993) (emphasis in original); *see also Mock v. State*, 848 S.W.2d 215, 218 (Tex. App.—El Paso 1992, pet. ref'd) ("Since [§ 3.02(a)] is not mandatory, an accused is not entitled to consolidation of offenses, as a matter of right, and the trial court did not abuse its discretion by failing to grant Appellant's motion to consolidate.") Baker has not cited any authority for the novel proposition that if the State elects to try offenses arising out of the same criminal episode separately or opposes a defendant's request to consolidate those offenses for trial, and the State tries the defendant for one offense, the State is barred, based on principles of equity or otherwise, from later prosecuting the defendant for the unconsolidated offenses.

Moreover, the "acceptance-of-benefits doctrine is a fact-dependent, estoppel-based doctrine focused on preventing unfair prejudice to the opposing party." *Kramer v. Kastleman*, 508 S.W.3d 211, 213 (Tex. 2017); *see also id.* at 217 (stating

73

estoppel "prevents litigants from taking contradictory positions as a means of gaining an unfair advantage from the inconsistency"); *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) ("Estoppel . . . generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit."); *see generally Estate of Johnson*, 631 S.W.3d 56, 61 (Tex. 2021) (stating doctrine of acceptance of benefits "arises out of equity's aversion to a claimant who seeks to exploit irreconcilable positions"). During the pretrial hearing in Baker's manslaughter trial, the prosecutor informed the court that the State elected to proceed with the manslaughter charge against J.B. only. Baker objected to the "piecemeal" nature of the proceedings and requested that the manslaughter charge against J.B. and the aggravated assault causing serious bodily injury charge against T.B. be consolidated and tried together because the offenses arose from the same motor vehicle collision. The State disagreed that the charges should be tried together and stated that it was "not the State's position that we will have two criminal trials. Our intention is to go forward on the criminal trial on the manslaughter . . . We're not asking for a second criminal trial later." The prosecutor also stated that the State was not dismissing the aggravated assault causing bodily injury charge at that time.[14]

---

[14]    Baker was not charged by indictment with injury to a child against T.B. until one week after the pretrial hearing.

74

The trial court overruled Baker's objection and trial commenced on the manslaughter case.

During trial, the court held a hearing on Baker's motion in limine "concerning the injured child [T.B.] who is no longer part of the Prosecution." Baker's counsel stated:

> Baker: Remember the State is not moving forward on the indictment as to the injured child [T.B.]. This case is only about the deceased child [J.B.].
>
> We would move for a limine on talking about anything about the injured child under grounds of relevance and undue prejudice and time needed and efficiency of trial. There's no charge in this particular trial for that child.
>
> . . . .
>
> Baker: Judge, this trial has nothing to do—this trial is—the defendant is charged with recklessly causing death of the 4-year-old [J.B.]. There's no charge in this trial for the 8-year-old [T.B.]. There might—maybe later, I don't know, but there's no trial for the 8-year-old here.

The record thus reflects that Baker was not mislead by the prosecutor's earlier statements and understood there was still a possibility he could be prosecuted in the future for any charges arising from the bodily injuries T.B. sustained in the collision. *See Ulico Cas. Co.*, 262 S.W.3d at 778 ("Estoppel . . . generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit."); *see also Kramer*, 508 S.W.3d at 217 (stating estoppel "prevents litigants

from taking contradictory positions as a means of gaining an unfair advantage from the inconsistency").

We overrule Baker's second issue.

## Conclusion

We affirm the trial court's denial of Baker's pretrial application for a writ of habeas corpus.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).